**Walter FRIEDRICH, Individually and on Behalf of Class of Similarly Situated Persons, Plaintiff,**

v.

**CITY OF CHICAGO and Fred Rice, Superintendent of Police in his Official Capacity, Defendants.**

**No. 84 C 7719.**

United States District Court, N.D. Illinois, E.D.

Sept. 18, 1985.

Harvey Grossman, Barbara P. O'Toole, American Civil Liberties Union, William Hannay, Schiff, Hardin & Waite, Chicago, Ill., for plaintiff.

Jonathan Siner, Asst. Corp. Counsel, Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

ASPEN, District Judge:

A class of street performers has sued the City of Chicago ("the City") challenging the constitutionality of an ordinance which allegedly violates the performers' rights to entertain pedestrians on Chicago's sidewalks. They claim violations of their First Amendment rights of expression and Fourteenth Amendment rights to equal protection of the laws. Last month we conducted a trial on plaintiffs' motion for a preliminary injunction enjoining the City from enforcing the ordinance. We converted the hearing into one for permanent injunctive relief. Having heard the testimony, reviewed the paper evidence and considered the parties' legal memoranda, we enter the following findings of fact ("findings") and conclusions of law ("conclusions") under Fed.R.Civ.P. 52.[1] For the reasons stated in those findings and conclusions, plaintiffs' motion for injunctive relief is granted in part and denied in part.

## FINDINGS OF FACT

### A. *The Ordinance in Question*

1. The original Chicago Street Performance Ordinance, Ch. 36.1 of the Municipal Code of Chicago, was enacted on September 28, 1983, and terminates on September 28, 1985.[2] (Plaintiffs' Ex. 1, Stipulation of Parties).

2. This ordinance regulates the manner in which street performers may perform in the public areas of Chicago. In particular, among other things, it establishes a permit system for performers, *see* Chapter 36.1–3; and it requires performers to be spaced at least 100 feet apart, *see* Chapter 36.1–5(e). Plaintiffs do not challenge these aspects of the ordinance.

3. The first amended Chicago Street Performance Ordinance, entitled "Ch. 36.1 of the Municipal Code of Chicago Amended Concerning Permitted Times For Street Performance," was enacted by a vote of 48–0 on January 23, 1985, and terminates on September 28, 1985. (Plaintiffs' Ex. 2, Stipulation of Parties).

4. This amendment, among other things, stated:

A performer may not use electric, battery operated or electronic amplification except by special permit issued by order of the City Council of the City of Chicago and shall comply in all respects with the Noise and Vibration Control provisions of the Environmental Control Ordinance, Sections 17–4.1 *et seq.* of the Municipal Code.

Chapter 36.1–5(c) (as amended). Plaintiffs challenge that fact that no permit system exists for these noise provisions.

4A. The City Council of the City of Chicago has promulgated no rules or regulations guiding their discretion in granting or denying special permits for the use of electric, battery operated or electronic amplification under § 36.1–5(c) of the Municipal Code of Chicago.

5. The first amended ordinance also states:

(d)(1) A performer may not block the passage of the public through a public area, and the location of any performer must allow at least six feet for the passage of the public through a public area

---

1. These findings and conclusions are sometimes hybrid. That is, some facts are embedded in conclusions and some conclusions may have seeped into factual findings. Where there are mixed questions of fact and law, this overlap is hard to avoid. Any finding or conclusion which is improperly designated should be considered as if it were properly labelled.

2. Because this ordinance is still in effect today, we perceive no mootness problems. The City has not raised a mootness issue. Indeed, the City wants a decision as much as plaintiffs do since, according to counsel, the City will likely re-enact the ordinance if we uphold it.

except as permitted by the sponsor of an event under paragraph (a) of this Section or otherwise allowed by the Commissioner of the Department of Streets and Sanitation. If a sufficient crowd gathers to see or hear a performer such that less than six feet is allowed or that the passage of the public through a public area is blocked, a police officer may disperse the portion of the crowd that is blocking the passage of the public. If a performer cannot conduct a performance in a location without blocking the passage of the public or allowing the required six feet of passage for the public, a police officer shall cause the performer to leave the location, but shall not prevent the performer from occupying another location in compliance with this Chapter.

(2) Notwithstanding the provisions of subsection (d)(1), the City Council may by a majority vote designate certain public areas in which greater space requirements for the passage of pedestrian traffic shall apply.

Chapter 36.1–5(d)(1)–(2) (as amended). Plaintiffs did not challenge this amendment in their complaint, but raised a challenge at trial.

5A. The first amended ordinance also prohibits performances everywhere in the City during late night and early morning hours:

(b)(1) A performance may take place at any time on a transit platform if said performance is not audible at any residence; otherwise, a performance may take place in any public area, but only at the following times:

Between the hours of 8:00 A.M. and 10:00 P.M. on Mondays through Thursdays;

Between the hours of 8:00 A.M. and 11:00 P.M. on Fridays;

Between the hours of 9:00 A.M. and 11:00 P.M. on Saturdays;

Between the hours of 10:00 A.M. and 10:00 P.M. on Sundays.

(2) Notwithstanding the provisions of subsection (b)(1), the City Council may by a majority vote designate certain public areas in which greater restrictions as to days, dates or hours of performance shall apply.

Chapter 36.1–5(b)(1)–(2) (as amended).

6. The second amended Chicago Street Performance Ordinance entitled "Amendment of Municipal Code, Ch. 36.1 Concerning Restriction For Street Performance in Near North Area" was also enacted by a vote of 48–0 on January 23, 1985, and terminates on September 28, 1985. (Plaintiffs' Ex. 3; Stipulation of Parties). Plaintiffs' suit focuses on this second amendment.

7. Passed under the authority of Chapter 36.1–5(d)(2), see Finding 5, the second amendment restricts the times and days of street performances in three relatively congested north side public areas. The exact street areas covered by the second amended Chicago Street Performance Ordinance are accurately highlighted on the maps in evidence. (Defendants' Exs. A, B and C).

8. Specifically, the second amendment limits performances in the three areas to the following days and times:

a. In the "North Rush Street" area, from April 15 through October 15, between 3 p.m. and 11 p.m. on any Wednesday, Friday, and Saturday, as well as certain holidays.[3]

b. In the "North Michigan Avenue" area, between 11 a.m. and 2 p.m. and 4–11 p.m. on weekdays; all day Saturdays and Sundays; any time between Thanksgiving and Christmas.

c. On Division Street, between Dearborn and State Streets, no performer may perform ever.

9. The Second Amended Ordinance contains a severability clause, which authorizes this Court to strike, if necessary, only unconstitutional parts of the ordinance.

---

3. The performances are also banned after 11 p.m. because of the original ordinance, which bans performances everywhere in the City after 10 p.m. on weekdays and Sundays, and after 11 p.m. on Fridays and Saturdays. See Finding 5A.

B. *The Nature of the Areas Covered by the Ordinance*

10. The Rush Street area is a center of Chicago's night-life, offering many bars, restaurants and sidewalk cafes, including many that close at 4:00 or 5:00 a.m. (Stipulation; Fed.R.Evid. 201(b)(1) (judicial notice)). Large numbers of people come to the Rush Street areas from all over the City and environs to be entertained. (Callaghan at 10; Rule 201(b)(1)). The crowds get especially heavy on Friday and Saturday nights. The Friday night crowd starts around 5:00 p.m. and escalates around 7:00 p.m. The Saturday crowd gathers around 7:00 p.m. and escalates around 9:00 p.m. (Callaghan at 10–11). Traffic conditions get extremely heavy at those times. (*Id.;* Rule 201(b)(1)).

11. Rush Street is one way with 1–2 traffic lights; one at Oak and one at Cedar. Traffic moves slowly, and conditions are made worse by taxicabs, people parking in no-parking spaces and cars parking in alleys. (*Id.*)

12. Besides the cars and pedestrian traffic, there are frequently 20–30 horse-drawn carriages offered for sightseeing which meander up and down Rush Street, State Street and Division Street. Many buses and taxicabs pass through this area. (*Id.* at 11–13). These vehicles exacerbate the crowded situation.

13. On Friday and Saturday nights the sidewalks are choked with people sightseeing, bar-hopping, dining and people-watching, as well as with prostitutes and other purveyors of illicit goods and services. The area has a carnival atmosphere. (*Id.;* Pepp at 13; Rule 201(b)(1)).

14. Because of the large number of retail and entertainment establishments and tourist attractions in the areas regulated by the challenged ordinances, pedestrians using the sidewalks in these areas commonly stroll aimlessly, slowly wander from place to place, sightsee and talk to other pedestrians they meet on the sidewalks. (Callaghan at 39; Bogue at 42; Def.Group Ex. R–6). Because of the width of the sidewalks, the obstacles on the sidewalk and the congestion, pedestrians often walk into the street. As described later, in 1983 and 1984 street performers also sometimes caused pedestrians to walk into the streets. It is also true, however, that pedestrians in the areas of Rush, State and Division Streets regulated by the challenged ordinance often walk into or across the streets, between cars, without being forced to do so and without street performers being present. (Callaghan at 49, 71, 91; Def.Exs. R–36, R–8).

15. As noted in the previous Finding, the sidewalks in parts of the Rush Street area are too narrow to handle the pedestrian flow on some Friday and Saturday nights. The sidewalks also contain many obstacles, including such things as parking meters, locked-up bicycles, newspaper machines, fire hydrants and sidewalk cafes. These facts are detailed further below:

(a) The sidewalks along Rush Street regulated by the challenged ordinances vary in width from six to twenty-three feet. Of the thirty-six locations along Rush Street where sidewalk measurements were taken, twenty-six locations had sidewalks measuring thirteen feet or wider and twenty locations had widths measuring fifteen feet or wider. (Stipulated Facts, Attachment A).

(b) The sidewalks along North State Street regulated by the challenged ordinances vary in width from seven to fifteen feet. (Stipulated Facts, Attachment A).

(c) The sidewalks along Division Street regulated by the challenged ordinances vary in width from seven feet to ten feet two inches. (Stipulated Facts, Attachment A).

(d) The sidewalks along those sidestreets in the vicinity of Rush, State and Division Streets regulated by the challenged ordinances vary in width from seven feet eight inches to twenty-four feet five inches. Of the thirty-five locations along those sidestreets where sidewalk measurements

were taken, twenty locations have widths measuring fifteen feet or wider and twenty-four locations have widths measuring twelve feet or wider. (Stipulated Facts, Attachment A).

(e) Flower pots, 4' × 4' or 5' along the Rush Street area interfere with the ability of pedestrians to walk down the sidewalks without going into the streets. (Callaghan at 15–16, 53–54). In addition, several restaurants put out tables and chairs, further blocking the sidewalks along Rush Street (Callaghan at 53), and the City has recently passed an ordinance permitting sidewalk cafes. (Munic.Code ch. 174.1).

(f) There are a total of 77 newspaper machines on the sidewalks along those streets in the vicinity of North State, Rush and Division Streets regulated by the challenged ordinances. (Stipulated Fact 22).

16. Division Street is the primary tavern, lounge and disco area of Rush Street. The sidewalks are only 7 to 10 feet wide and contain numerous parking meters and light poles. On especially crowded nights in 1984 (such as after Chicago Cubs' baseball games), wooden barricades were put up at least five feet into the street, extending the sidewalks by that much. Putting the barricades up narrowed the vehicular traffic from two lanes down to one, making the traffic more congested. (Callaghan at 16–17, 98).

17. Barricades are not usually used on Rush Street because the sidewalks are wider there. (*Id.*) However, on rare occasions, such as the night of July 3, 1984, when crowds from the Grant Park fireworks show flooded the area, the police closed Rush Street to vehicular traffic, from Chestnut to Cedar Streets. (Callaghan at 102). Street closings in the area of Rush, State and Division Streets during the spring, summer and fall of 1984 were not a result of the presence of street performers. (Callaghan at 102).

18. On the first block of State Street south of Division Street, the pedestrian flow is similar to that on Division Street; i.e., the sidewalks are very narrow, pedestrian flow is difficult and wooden barricades sometimes would be used. (Pepp at 16).

19. North Michigan Avenue is one of the great urban thoroughfares in the world, comparable to New York's Fifth Avenue. (Whyte testimony). The area, which includes the world-renowned "Magnificent Mile," is a business, shopping and entertainment area and, to a lesser extent, a residential area. The street is lined with luxury hotels, posh clothing and jewelry stores, fancy restaurants and architectural landmarks. The cross streets include much of the same, as well as luxury apartments and condominiums. (Defendants' Ex. D; Rule 201(b)(1) ).

20. Michigan Avenue attracts people from outside the area because of its reputation and its close proximity to downtown and McCormick Place Convention Center; people come there to shop or browse, as well as tour. (Flanagan at 6–7; Rule 201(b)(1) ). On North Michigan Avenue pedestrians frequently window shop at a leisurely pace. (Flanagan at 15). Others move more briskly, going to and from work or other appointments. (*Id.* at 13).

21. The sidewalks in the Michigan Avenue area have the following characteristics:

(a) The sidewalks along Michigan Avenue regulated by the challenged ordinances vary in width from three-and-one-half to thirty-and-one-half feet. Of the twenty-three locations along Michigan Avenue where sidewalk measurements were taken, fifteen locations have widths measuring twelve feet or wider. (Stipulated Facts, Attachment A).

(b) The sidewalks along the sidestreets in the vicinity of North Michigan Avenue regulated by the challenged ordinances vary in width from four feet four inches to twenty-five feet three inches. Of the thirty-six locations along those sidestreets where side-

walk measurements were taken, sixteen locations have widths measuring twelve feet or wider. (Stipulated Facts, Attachment A).

(c) Encroachments on some of the sidewalks of North Michigan Avenue, such as flower boxes and plots of grass, take up 50% of pedestrian walkway space. (Whyte at 12, 13).

(d) There are a total of 130 newspaper machines along the areas of North Michigan Avenue and the sidestreets in the vicinity of North Michigan Avenue regulated by the challenged ordinances. (Stipulated Fact 21).

22. The vehicular traffic on North Michigan Avenue is very congested because of the number of cars, taxis, buses and horse-drawn carriages travelling through the area every day, frequently from early morning through late evening. (Flanagan at 6).

23. In particular, four lanes, including the curb lane, of traffic move up and down Michigan Avenue south of Chicago Avenue, and three lanes move north of Chicago Avenue, in each direction. More than ten bus routes travel north and south on Michigan Avenue. A bus stop is situated at almost every corner, but not all buses stop on every corner because some are express routes and stop only at major intersections. There are also horse-drawn carriages with loading zones in that area. (Flanagan at 8).

24. A combination of the cars, buses, horse-drawn carriages, pedestrians and bicyclists makes the area congested, especially toward the north end of the strip, near Water Tower Place. The heaviest times are between 11:00 a.m.–2:00 p.m., and 4:00 p.m.–7:00 p.m. Weekends are a little less congested. (Flanagan at 9, 16).

25. Weekends are still congested with different groups of people on the weekend, primarily shoppers instead of business people. (Flanagan at 10). There are busy times for vehicular traffic on weekends, during the warm weather months and when the stores are open on North Michigan Avenue. On Saturday from 9:00 a.m. to 5:00 p.m., people come there to shop and also to any special event such as the Air and Water Show. There is also an overflow from the beaches. (Flanagan at 12). Sunday afternoons are also a busy time. (Flanagan at 13).

26. The sidewalks in the area, although wide in some locations, are often crowded with people. This is partly the result of people browsing and looking in windows, especially with more of a leisurely crowd on the weekends. Many pedestrians come for entertainment and take their time. (Flanagan at 15).

27. One of the most congested areas on the street is the area in front of Water Tower Place, because of the amount of people that walk in and out of the complex. It is also a major discharge and entrance place for people getting on and leaving the CTA buses and taxicabs. (Flanagan at 16). The sidewalks in front of the Chicago Pumping Station are narrow, and there are usually many people traversing the area. (Flanagan at 16).

28. Harry F. Bodlak has been the Superintendent of Traffic Service in charge of the Field Statistics Section of the Chicago Department of Public Works since 1970. He is qualified to testify as an expert witness on the vehicular and pedestrian traffic flows in the City of Chicago. (Stipulation, Defendants' Exs. L1–L15). The detailed traffic study counts and summary of vehicular and pedestrian traffic in Defendants' Exhibits L3–L15 for selected areas in the North Rush Street area, the North Michigan Avenue and other areas of the City are accurate and corroborate the testimony as to the heavy traffic and pedestrian congestion in the areas covered by the ordinance. We refer to these studies as relevant in our Conclusions of Law.

29. To sum up, the public areas of the Near North Side regulated by the challenged ordinances are among the most attractive and crowded entertainment and shopping areas in the City of Chicago for both residents and tourists. (Stipulated Facts 1 & 2). The Rush Street area is

composed essentially of wall-to-wall bars, night clubs and restaurants. It purports to be what it in fact is: a place for partying. The street performers complement the carnival atmosphere quite well. The North Michigan Avenue area, on the other hand, is primarily a high-fashioned shopping area, with some elegant residential and office buildings, hotels and restaurants as well. One might describe the atmosphere as one of sophistication, rather than carnival-like. The mesh of this area with the street performances does not enjoy the same superficial compatibility as the Rush Street/street performer mesh. Both the North Michigan Avenue and Rush Street areas understandably are desirable locations for street performances because of the amount of pedestrian activity there. The performers have a huge ready-made audience, some of whose members are willing to be entertained and to pay for this entertainment. No other areas in Chicago, with the possible exception of the State Street Mall and other downtown locations, provide audiences for street performances comparable in size to those at the North Michigan Avenue and Rush Street areas. (Nelson; Friedrich; Toles-Bey; Bogue at 14, 43–44).

C. *The Performers: Who They Are, What They Do and Conditions They Cause*

30. The Second Amended Ordinance's restrictions have prevented many performers from working in the areas covered by the ordinance. Street performers would perform in many parts of the North Michigan Avenue and Rush Street areas if it were not for the amendments to the Street Performance Ordinance which prohibits performances in those areas. (Nelson, Friedrich; Toles-Bey testimony). The number of street performer permits issued by the City of Chicago dropped from 763 permits issued in 1984 to 567 permits issued in 1985. (Stipulated Fact 25).

31. Street performers vary, including such artists as accordion players, flute players, banjo players, portrait artists, jug-

glers, storytellers, mimics and comedians. (Callaghan at 19; Bogue at 10).

32. While some performers, especially musicians, play primarily to entertain and/or earn money, others also perform to make political and social commentary. (Nelson, Toles-Bey testimony). Some performers also play to practice and/or to drum up business (i.e., "get gigs"). (Friedrichs, Nelson, Toles-Bey testimony).

33. The ordinance does *not* regulate "performances" by street preachers, religiously affiliated solicitors and petitioners for political causes. (Chapter 36.1–1(a); concession of City at closing argument). For example, the religious group "Jews for Jesus" was allowed to put on a dramatic presentation around July 20, 1985, in the Rush Street area, despite the ordinance as amended. (Bogue at 46).

34. The street performers who presented the greatest problems in 1983 and 1984 were the "breakdancers." (Flanagan at 18–19). "Breakdancing" is a form of dancing, usually done by one person at a time, which involves a great deal of twirling and spinning, especially spinning on one's back, one's arms, one's feet or even one's head. It was very popular in 1983–84 and even spawned several motion pictures. (Rule 201(b)(1)).

35. Breakdancers generally came toting a piece of cardboard or linoleum, approximately 4' × 4' or 6' × 6', which they would lay on the sidewalk at the building line. As the dancers would whirl on their portable surfaces, audiences would often gather to watch. (Flanagan at 20; Callaghan at 20–21).

36. Breakdancers generally occupied six to ten feet of the sidewalk's width for their shows. (Callaghan at 23; Flanagan at 21). They would attract five to fifty people, who would form a semi-circle around the performers, sometimes occupying all available space on the sidewalk. (Callaghan at 20; Flanagan at 21). When these crowds grew large, pedestrians wanting to pass through would either squeeze through the crowd or circle it by walking into the street. This detour would in turn disrupt traffic on the

street, exacerbating traffic conditions. (Flanagan at 22). In part because of the performances, pedestrians and drivers would be distracted. (Callaghan at 24–25). This chain of events is inherently unsafe, both for pedestrians and drivers.

37. Fortunately, despite the conditions described in the preceding paragraph, no pedestrian has ever been struck or injured by an automobile or other vehicle while walking in the street in order to avoid persons watching a street performer in any of the areas affected by the challenged ordinance. (Stipulation 20).

38. Street performers were commonly observed in the restricted area in 1984 from April 18 until the end of the warm weather. Usually they were breakdancers in a group. (Flanagan at 18). Around Rush Street, they performed mostly on Friday and Saturday nights from 7:00 p.m. until 11:00 p.m., and on the eve of holidays. (Callaghan at 19).

39. The City admits that up to 60%–70% of the street performers in 1984 were breakdancers. (City's Proposed Finding 91). In the Michigan Avenue area they most commonly performed in front of 777 North Michigan Avenue or in front of Walgreens on Michigan and Chicago, Water Tower Park on the northwest corner of Chicago and Michigan, and the northeast corner of Chestnut and Michigan. Performance times were typically in early evening, 6:00–10:00 p.m., but took place at other times as well. (Flanagan at 19).

40. Breakdancers and other performers also performed in 1984 in front of the Manhattan Club on Elm or Cedar and Rush Streets, and next to the Kentucky Fried Chicken on Rush. There occasionally have been performers from Cedar Street to Elm Street on the east side, where the street is very narrow, and on the west side at McDonald's and Walgreens which is very busy with people coming in and out. (Callaghan at 35). Breakdancers were also spotted on the corner of Oak and Rush and State and Elm. A flute player was observed on State and Elm and a magician on the corner of Oak and Rush. (Callaghan at 21–22).

41. Although breakdancers were the primary "crowd generators" in 1984 (Callaghan at 90), other performers did on occasion draw large crowds. (*See, e.g.*, Def. Exs. R–30–33; Bogue at 12; Callaghan at 90). But breakdancers created far more problems than other performers in 1984. (Flanagan at 19; Callaghan at 90). In fact, pedestrians in the Michigan Avenue area have not had to walk out into the street to avoid the audience of a guitarist or any kind of street performer other than breakdancers. (Flanagan at 39).

42. The quality and popularity of performances vary widely. Many of the musicians play alone, attracting a few listeners at a time who pass on after a song or two. (Callaghan at 20, 90). In situations like this, performers do not significantly disrupt or endanger pedestrian traffic. (Def. Exs. R–24 to R–27; Callaghan at 60, 65). Even the breakdancers did not always draw large crowds. Only "good" breakdance groups would attract a large crowd in the summer of 1984 in the Rush Street area. If breakdancers were not "good," they would attract an audience of only four or five people. (Callaghan at 22).

43. To some extent, street performers and their crowds were self-regulating. Audiences generally do not exceed fifty or sixty, because additional people would have to stand in the back and could not see well. (Whyte at 21). Sometimes the more experienced performers can control the crowd and direct them to leave passage on the sidewalks. But many performers, especially breakdancers, were inexperienced and did not control the crowds. Performers and crowds would generally cooperate with police requests to clear a path on the sidewalk. (Flanagan at 32; Callaghan at 26, 93–94). But if police left to do other things, crowds would quickly refill the sidewalks. (Flanagan at 33).

44. To some extent, street performers are self-regulating as to where they perform. They do not perform on the narrowest sidewalks. Thus, they did not perform on Division Street or on State Street be-

tween Elm and Division. (Callaghan at 21, 35).

45. A major problem on Rush Street was with "pirate" breakdancers, that is, inexperienced, unlicensed breakdancers who did not know how to handle and control the crowds. (Callaghan at 93). 60 to 70% of the breakdancers on Rush Street were unlicensed. (Callaghan at 90). 80 to 85% of the breakdancers on Michigan Avenue were unlicensed. (Flanagan at 40). By the end of summer 1984, Lt. Callaghan's enforcement of the 1983 ordinance had reduced to some extent the number of "pirate" performers and, in turn, the problem on Rush Street. (Callaghan 85).

46. In sum, the breakdancers presented most of the crowd-control and safety problems in 1984.

47. Street performers are not the source of congestion in the Michigan Avenue and Rush Street areas. (Bogue at 44; inference from findings). Crowds exist without them. However, seeking money and/or attention, street performers go where the crowds are. When they are popular enough to draw a substantial audience, they do exacerbate the already existing congestion problems and can cause a safety hazard.

D. *Residents' Complaints*

48. During 1983 and 1984, some residents on the sidestreets on North Michigan Avenue and in the Rush Street area were annoyed and inconvenienced by the amplification used by breakdancers and the instruments played by other street performers. (Sikokis, Petach, Griffin & Rosenblum testimony).

49. Such noise on occasion prevented residents from easily conversing in their apartments, listening to radio or television and sleeping. (*Id.*). Their main complaint at trial was noise. Excessive noise levels violate the City's general noise ordinance. (Pl.Ex. 6).

50. In addition, the crowds on North Michigan Avenue and around Rush Street who stop and watch street performers have been so large that residents have been blocked from entering and existing their residences and have been forced to walk in the streets in order to pass these crowds blocking the sidewalks. (*Id.;* Defendants' Ex. Q).

51. The above conditions affecting residents were most severe on Friday and Saturday evenings. (*Id.*).

E. *Police Staffing and Response to the Crowds*

52. The size and nature of the crowds in the Rush Street and Michigan Avenue areas create many types of police problems, such as heavy traffic, prostitution, drugs, drunkenness, disorderly conduct, shoplifting and pickpocketing. (Def.Ex. H). Given these extensive problems, street performers in 1984 presented a significant, but relatively secondary, problem for the police. (Callaghan at 80, 87).

53. No street performer has ever been arrested for violation of any City ordinance or state statute regarding impeding or blocking pedestrian traffic, obstructing sidewalks, blocking ingress or egress or disorderly conduct while performing in any of the regulated areas affected by the challenged ordinance since the passage of the 1983 ordinance. (Stipulated Fact 18). This reflects the fact that it is not a proper method of crowd control to arrest street performers or audience members for disorderly conduct if they are blocking the sidewalks. (DiGrazia at 48, 54). In 1984, the general practice of the police was to monitor crowds, ask them and performers to keep space open on the sidewalks and issue warnings if necessary. Police would also persuade many "pirate" performers to leave the street at the end of a performance.

54. Even after the Second Amended Ordinance went into effect, the police did not always enforce it. Police have allowed performances at prohibited times when the performers did not interfere with pedestrian traffic. (Bogue at 11, 41).

55. The police also exhibit great tolerance toward the volume of pedestrians

attracted to the areas regulated by the challenged ordinance. It is the practice of the Chicago Police Department to permit tavern patrons to occupy one-half of the sidewalk while waiting to enter an establishment. (Callaghan at 55; Def.Ex. R–17). Deputy Chief Pepp has issued no rules or instructions regarding use of the sidewalks to accommodate lines of tavern patrons. He understands that normal police procedure is to permit waiting tavern patrons to occupy one-half of the public sidewalk. (Pepp at 34, 70).

56. In June 1984, Lt. William Callaghan was assigned to the Rush and Division Street areas in May 1984 and served there until December 1984. (Callaghan at 4). Lt. Callaghan's assignment was the first time that the department tried to establish a systematic approach to the diverse problems in the area. (Callaghan at 81).

57. Upon his assignment to Rush and Division Streets, Lt. Callaghan evaluated the law enforcement needs of the area and requested the assignment of additional police officers and tow trucks. (Def.Ex. H). Though detailing a litany of problems in this report, Lt. Callaghan did not mention street performers at all, and thus did not explicitly base his request for more staffing on problems caused by street performers.

58. The total number of officers authorized for possible assignment to Lt. Callaghan in spring 1984 consisted of one sergeant and twelve officers; two tactical teams consisting of one sergeant and eight officers each; five mounted police and the summer mobile force of one sergeant and ten officers. (Callaghan at 8).

59. On weekends during the months of July and August of 1984, Lt. Callaghan requested two additional tactical teams, each consisting of one sergeant and eight officers. (Callaghan at 9). The tactical teams would come from other police districts. (Callaghan at 5).

60. By the fall of 1984, the Summer Mobile Force ended, so Lt. Callaghan lost one sergeant and ten men. By late October, Callaghan gave up the tactical team mounted unit and was left with the basic staff, one sergeant and twelve men. (Callaghan at 9).

61. On a very active night on Rush Street, as many as sixty-two to sixty-seven policemen, including supervisors, would be assigned. If there was a special event and the weather was going to be warm, additional tactical teams would be requested. (Callaghan at 37). The norm of men assigned on Fridays and Saturdays was around fifty, and even with a full sixty-seven man contingent, it was not enough to handle the crowd conditions in the Rush Street area well. (Callaghan at 38).

62. The crowds during 1984 and during the summer months of 1985 have been much heavier than the crowds shown in the photographs marked Defendants' Exhibits R–1 through R–38, taken Friday night, April 19, 1985, from 8:00 to 10:00 p.m. (Callaghan at 41–71, Bogue at 22), which generally show moderately heavy crowds.

63. The staffing numbers detailed above reflect *potential* staff, that is, those assigned on any given night. However, because of illnesses, vacations and other reasons, the *actual* police staffing for the Rush Street detail during the months of June, July, August and September of 1984 was less than the maximum authorized number testified to by Lt. Callaghan and by Deputy Chief Charles Pepp (Def.Ex. P), averaging around 25–30 officers on Friday and Saturday nights.

64. The number of personnel assigned to the Rush Street detail on Wednesday nights during the period from September 1, 1984 to October 5, 1984, never exceeded eight officers. (Def.Ex. P). The number of personnel assigned to the Rush Street detail on Wednesday nights during the period from April 3, 1985 to July 10, 1985, exceeded eight officers on only two occasions. (Bogue logs Def.Ex. J).

65. The Michigan Avenue patrol was created to deal with the crowded conditions of pedestrian and vehicular traffic in that area. On this detail, during the day from 6:00 a.m.–2:00 p.m. there are fourteen men,

and from 2:00 p.m.–10:00 p.m. there are eleven men. (Flanagan at 1–5). Sergeant Flanagan, in charge of this detail since April 1984, has never requested more police for this 2–10 p.m. shift. (*Id.* at 34).

66. This patrol is made up of police officers in uniform who patrol the area on foot. On a day-to-day basis during the rush hours, they maintain traffic control at an intersection assigned to them daily. Before and after rush hours, they patrol Michigan Avenue and surrounding side streets, enforce parking regulations and conduct premise checks on businesses. (Flanagan at 5).

67. When audiences around street performers got large enough in 1984 around Michigan Avenue to cause unsafe conditions described in Finding 36, a portion of the sidewalk would be opened up to allow pedestrians room to pass through, and people were asked to disperse or reposition themselves in an attempt to keep the area free for people to walk. This required constant attention whenever these conditions existed. (Flanagan at 23). Banning performers only in parts of North Michigan Avenue would not significantly alleviate police problems, since performers would congregate and attract audiences at other crowded points. (Flanagan at 26).

68. Some of the performers were eliminated because they had not been properly licensed. (Flanagan at 24). Similarly, in the Rush Street area, increased enforcement of the license requirement in the late summer and early fall of 1984 reduced somewhat the problems caused by street performers. (Callaghan at 85, 90). Also conditions improved in 1984 as the new manpower repeated and therefore better learned their duties and how to deal with street performers. (*Id.* at 82).

69. Since the ordinance at issue has been in effect, officers in the Michigan Avenue area have never been called to a scene to redirect pedestrian and vehicular traffic because of street performers. The performers have generally been abiding by the ordinance. The crowd flow is safer than it was before the ordinance. There have been no pedestrians forced into the streets because of a crowd gathering.

70. In sum, on the basis of the above findings, as well as the record as a whole, the Court further finds that the combination of the large crowds, the requisite amount of police staffing and the knots caused by popular performers, strained police resources which are needed for the myriad other problems in the Rush and Michigan areas. Even though the performers were one problem among many and even though most arrests occurred after 11:00 p.m. at Rush Street when performers had left the scene (Callaghan at 121), a serious resource allocation problem existed during those times when performers drew large audiences *and* when large crowds were already on the sidewalks. Given the presence of the high-crime Cabrini Green area in the same police district and the already large, increased staffing devoted to the area, it would not have been a reasonable alternative for the Department to drain police resources from other areas in the City to deal with the added problems caused by street performers. Arresting performers or large audiences for disorderly conduct is also not a valid alternative.

71. Present police resources *are* adequate to deal with the typical performer who draws only a tiny audience. Since the majority of the large audiences watched breakdancers and since evidence suggests that breakdancing is a passing fad, Finding 70 (which is based in part on the evidence that relatively large audiences were common in 1983 and 1984) might be re-evaluated in future summers.

F. *The City's Research Regarding the Ordinance*

72. The original Street Performers Ordinance, which contained no special restrictions for the Rush Street and North Michigan Avenue areas, passed the City Council and was signed by the Mayor in 1983 despite the vigorous protests of many businesses and residences in those areas. (Def.Ex. N).

73. Alderman Natarus, whose ward includes the relevant areas, continued to receive complaints once the performers began playing. Although hearsay as to the truth of the statements in the letters in Exhibit N, the statements in the letters are admissible to show that Alderman Natarus received dozens of complaints. The residents and businesses primarily complained that the performers downgraded the aesthetic quality of the neighborhood or played bad music, thereby threatening to hurt tourist and shopping trades. However, there were also some complaints about excessive noise and crowds which caused safety problems and obstructed building entrances. (*Id.*).

74. Although these letters and other complaints no doubt prompted the City Council to pass the two January 1985 amendments, no letters, affidavits, documents, reports or studies, measurements of sidewalk widths or pedestrian flow data were submitted to the City Council or any committee of the City Council in connection with the January 23, 1985 Amendments. (Stipulation 27).

75. The only two people who testified before the City Council or any committee of the Council in connection with the January 23, 1985 Amendments were Alderman Burton F. Natarus, the sponsor of the Amendments, and Assistant Corporation Counsel Jonathan P. Siner, who litigated this case on behalf of the City. (Stipulation 26).

76. Although the City failed to conduct a comprehensive study of the use of the sidewalks by the street performers and resultant pedestrian traffic patterns prior to the passage of the 1985 amendments, these amendments were a good faith attempt by the City Council to respond promptly and in a limited manner to the complaints as presented. Our Conclusions of Law set forth how the City Council succeeded and where it failed.

## CONCLUSIONS OF LAW

### A. *Procedural Matters*

1. This Court has jurisdiction of this cause pursuant to 28 U.S.C. Section 1343(3) and (4), and venue in the Northern District of Illinois is proper.

2. The Court concludes and the City does not contest that this case is properly brought as a class action pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure on behalf of a class consisting of all persons who presently or in the future desire to give artistic performances in the public areas of Chicago and the North Michigan Avenue, Rush Street and Division Street areas of Chicago. The Court finds further that the defined plaintiff class is so numerous that joinder of all class members is impracticable, that there are questions of law and fact common to the class, that the claims of the named plaintiff are typical of the claims of the class, that the named plaintiff has fairly and adequately represented the class, and that the defendants have acted on grounds generally applicable to the class, thereby making appropriate declaratory and final injunctive relief with respect to the class as a whole.

### B. *First Amendment Standards*

3. Performances in the public areas of the City of Chicago by plaintiffs who hold street performance licenses are a form of expression protected by the First and Fourteenth Amendments of the United States Constitution. *See Schad v. Borough of Mount Ephraim*, 452 U.S. 61, 65, 101 S.Ct. 2176, 2181, 68 L.Ed.2d 671 (1981) (live entertainment); *Cinevision Corp. v. City of Burbank*, 745 F.2d 560, 567 (9th Cir.1984) (rock concerts); *Reed v. Village of Shorewood*, 704 F.2d 943, 950 (7th Cir. 1983) (rock music in a bar); *Davenport v. City of Alexandria, Va.*, 710 F.2d 148, 150 (4th Cir.1983) (street musician).

4. Just as the First Amendment protects plaintiffs' expression, it also extends special protection to the places where plaintiffs want to perform, the sidewalks. The sidewalks in the areas covered by the ordinance are "public forums." "Sidewalks, of course, are among those areas of

public property that traditionally have been held open to the public for expressive activities and are clearly within those areas of public property that may be considered, generally without further inquiry, to be public forum property." *United States v. Grace,* 461 U.S. 171, 103 S.Ct. 1702, 1708, 75 L.Ed.2d 736 (1983) (holding, *inter alia,* that public sidewalks abutting Supreme Court grounds are public forums for purposes of First Amendment analysis).

▉ 5. Because the sidewalks covered by the ordinance constitute a public forum, "the government's ability to permissibly restrict expressive conduct is very limited." *Id.,* 103 S.Ct. at 1707. In general, time, place and manner regulations may be enforced if they are (1) reasonable, (2) content-neutral, (3) narrowly tailored to serve a significant government interest, and (4) leave open ample alternative channels of communication. *Id.* (Citations omitted); *see generally Wisconsin Action Coalition v. City of Kenosha,* 767 F.2d 1248, 1252–53 (7th Cir.1985). However, the Court may uphold an absolute prohibition on a particular type of expression only if the prohibition is narrowly drawn to accomplish a compelling governmental interest. *Grace,* 103 S.Ct. at 1707; *see also Cornelius v. NAACP Legal Defense & Education Fund,* ── U.S. ──, 105 S.Ct. 3439, 3448, 87 L.Ed.2d 567 (1985). The restrictions at issue, while content neutral within the class of performers as defined by the ordinance,[4] is not neutral with respect to the type of speaker, since it does not embrace many other classes of speakers and "performers," such as leafletters, picketers or preachers. This does have content-based implications. *See* Conclusion 33; *cf. Police Dept. of Chicago v. Mosley,* 408 U.S. 92, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972) (analyzing under narrower standard ordinances which restrict some but not all types of picketing). As such, the more restrictive First Amendment analysis applies to this case: the ordinance must be narrowly drawn to serve a "compelling" interest rather than a

"significant" interest. The City agrees that the ordinance must narrowly serve a compelling governmental interest. *See* City's Pretrial Memorandum of Law in Opposition at 4.

6. The requirement that the restrictions narrowly fit the government's legitimate and compelling interests implies both (1) that those restrictions must actually serve those interests and (2) that alternatives less restrictive of first amendment rights cannot adequately protect those interests. *See Wisconsin Action,* 767 F.2d at 1252.

7. The City bears the burden of showing that its ordinance satisfies the demanding standards of conclusions 5 and 6. *Id.*

### C. *Application of Legal Standards*

▉ 8. The City has satisfied its burden of showing that its interests are compelling. When street performers have drawn crowds large enough to divert pedestrians into the streets in issue, both pedestrians and drivers are endangered. The City has a compelling interest in remedying this dangerous situation.

8A. To the extent the City fails to carry its burden of proof, we may "surgically exise" the offending parts of the ordinance, but we may not drastically rewrite the ordinance in the process. *See, e.g. American Booksellers Ass'n, Inc. v. Hudnut,* 771 F.2d 323, 332 (7th Cir.1985).

9. The City must also prove that the restrictions chosen in the ordinance actually and narrowly further its compelling interests. In several respects it plainly has not done so:

(a) *Times.* The City conceded at closing argument that, with respect to the Rush Street area, the ordinance takes effect sooner than necessary on days it applies. The ordinance begins at 3:00 p.m. on such days, and the City conceded that the first two hours were unnecessary, and may be stricken under the ordinance's severability clause, since the crowds in the Rush Street area are not dense until after 5 p.m. We

---

**4.** The ordinance defines "perform" to include, but not be limited to, "acting, singing, playing musical instruments, pantomime, juggling, magic, dancing and reciting." Chapter 36.1–1(a).

conclude that the first four hours are not necessary to serve the City's goal of protecting pedestrian safety. By admission of the former head of the Rush Street Police Detail, crowds do not get serious until after 7:00 p.m. on Friday and Saturday nights. *See* Finding 10; *see also* Callaghan testimony at 49. Thus, the ordinance violates the First Amendment to the extent it applies to the Rush Street area before 7:00 p.m. Friday and Saturday nights.

(b) *Dates.* Although the City contends that crowds in the Rush Street area were serious on Wednesday nights, the evidence failed to show that the crowds came anywhere near the levels of Friday and Saturday nights. Most of the testimony and evidence focussed on Friday and Saturday nights; moreover, the police staffing reports show that staffing was significantly increased only on Fridays and Saturdays in 1984 and 1985, further suggesting that crowd conditions were not severe on Wednesdays. *See* Finding 65. In fact, police staffing on Thursdays was usually higher than Wednesdays even though Thursday nights are not covered by the ordinance for the Rush Street area. *Id.* In sum, the City has failed to show that the ordinance actually furthers its interests in crowd control on Wednesday nights. Thus, the ordinance violates the First Amendment to the extent it unnecessarily prohibits street performances on Wednesday nights in the Rush Street area.

(c) *Places.* The ordinance also covers a broader geographical area than necessary to achieve the City's compelling interest in safety. The evidence showed that serious crowd problems existed in the Rush Street area only north of Oak Street.[5] Moreover, we can take judicial notice that crowds are much heavier in this area than the area along Rush south of Oak. Thus, the ordinance violates the First Amendment to the extent it reaches Rush Street south of Oak.

10. In most other respects, however, we conclude for the reasons below that Section 1 of the Second Amended Ordinance is constitutional in 1985.

11. With respect to the Rush Street area, Section 1(a) of the Second Amended Ordinance (as pared in Conclusion 9) restricts plaintiffs' First Amendment rights no more than necessary to further the City's compelling interest in pedestrian safety. The ordinance operates specifically only when crowds are at their densest—7–11 p.m. on Friday and Saturday nights—and only when street performances are most common. The combination of extremely dense crowds and a popular performer chokes pedestrian flow and forces pedestrians into the street, creating a hazardous situation. See Finding 36. Restricting performers only during these times of extreme crowd density actually protects public safety. As the Supreme Court stated in *Grayned v. City of Rockford*, 408 U.S. 104, 115–16, 92 S.Ct. 2294, 2303, 33 L.Ed.2d 222 (1972), "[a] demonstration or parade on a large street might put an intolerable burden on the essential flow of traffic, and for that reason could be prohibited." We think that the situation on Rush Street on Friday and Saturday nights is analogous to such conditions.

12. We disagree with plaintiffs' position that the ordinance will not alleviate crowd conditions. Plaintiffs are surely right that crowds are very dense whether or not street performers play; thus, banning street performers does not reduce the number of people on the street. But banning them at the most crowded times does affect *where* those people congregate, and thereby significantly reduces the dangers to pedestrians. Performers do not draw crowds into the area, but popular performers act like a magnet to concentrate the crowds that are there and create a "magnetic field" which deflects other pedestrians into the street. In this way, the popular performers do proximately cause special hazardous conditions at the most

---

**5.** For example, the current head of the Rush Street detail, Lt. Bogue has told performers that they can play anywhere south of Oak Street if they want, because conditions are much less congested there. *See* Bogue testimony at 14.

crowded times. The ban at those times does remedy this dangerous condition.

13. We also disagree with plaintiffs that the City had reasonable, less restrictive alternatives available to it. While, in theory, more police could have dealt with large audiences as they erupted, we do not think the number of police actually on the street could have, on a consistent basis, adequately handled the audiences caused by street performers in addition to the many other crowd control duties they need to perform. True, the police "got by" in 1984. No pedestrian to our knowledge was hit by a car because of street performers. But the police resources were stretched already. So long as large audiences are common, as they were in 1983 and 1984, several police officers are needed to deal with these problems instead of the other pressing problems in the area. And we do not think it is reasonable to expect the City to drain police from other parts of the City—many of which are high crime areas—merely to cope with the additional problems caused by street performers. In creating the Rush Street Detail and other measures, the police already devoted substantial resources to the area. In sum, we think the City has shown that increased police staffing is not a viable alternative to the narrow ban in the Rush Street area.

14. Nor is persistent patrol by current police staff an adequate, less restrictive alternative to the restrictions. It is true in general that enforcement of existing laws, where practicable, is preferred to prior restraints on speech. "A free society prefers to punish the few who abuse rights of speech *after* they break the law than to throttle them and all others beforehand." *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 559, 95 S.Ct. 1239, 1246, 43 L.Ed.2d 448 (1975). Plaintiffs claim that the police adequately controlled audiences in 1984 and could continue to do so by strictly enforcing licensing provisions to rid the streets of pirate performers, by enforc-

ing the ordinance's rule that performers be spaced at least one hundred feet apart and by monitoring large audiences on the few occasions they do erupt. While police did this to some extent in 1984, and got better at doing so, *see* Finding 68, this monitoring still put a serious strain on police resources. Given the frequency of large audiences in 1984, we do not think the alternative of "stepped-up enforcement" fully deals with the safety problems.[6] If the police were to do so, it would necessarily come at the expense of other needed police services.

15. In sum, we conclude that changes in police staffing or practices were not a reasonable, less restrictive alternative to the restrictions in the Rush Street area. However, in light of Findings 70–71, we observe that this conclusion depends heavily on the fact that large audiences were common in 1983–84. In the normal situation where performers draw a nominal audience, no hazards exist, and police resources are not taxed. And if large audiences are uncommon, then current police resources *can* adequately monitor the few situations when audiences get large without straining police ability to cope with other law enforcement responsibilities. Thus, if it is true that breakdancing has gone the way of the hula hoop and is a faded fad, then perhaps the frequency of large audiences has substantially fallen. We think that given the frequency of breakdancers in 1983 and 1984, the City reasonably expected large audiences and hazardous conditions in 1985 and chose necessary means to deal with the problem. However, this could well prove untrue for future years, since the evidence showed that so many of the large audiences existed because of breakdancers. Thus, if the City chooses to renew the ordinance next year, it would be well advised to consider the passing of the breakdancing phenomenon in its evaluation. If it has passed, and if—as the evidence

---

**6.** For example, the head of the Michigan Avenue detail emphasized that although crowds would generally respond to police requests to clear space on the sidewalks for passage, the space would clog up again as soon as police turned away to cope with other duties. *See* Flanagan testimony at 33.

showed—most other performers attract only small crowds, the constitutional underpinnings of the ordinance may have vanished for future years, since the City would no longer have the compelling public safety problem of the magnitude experienced in 1983 and 1984, and police could probably handle the residual problems. On the other hand, fads by definition are difficult to predict. However, if some new entertainment fad arises which, like breakdancing, requires large sidewalk space and attracts big crowds, the demise of breakdancing may nevertheless fail to affect the constitutional underpinnings of the ordinance in future years. We express no firm opinion on this point, leaving the question for the City to very carefully evaluate if it decides to re-enact the Second Amended Ordinance.

16. We also reject plaintiffs' argument that closing off Rush Street to vehicular traffic on Friday and Saturday nights is a viable, less restrictive alternative to the ban on those nights. The traffic is very heavy all through that area, and closing off Rush Street would tangle traffic even further. While First Amendment jurisprudence demonstrates great respect for the rights of speaker in public forums, plaintiffs have shown us no case where a court was so solicitous of speaker's rights that it required a city to close off a main street twice a week for six months every year in order to accommodate the speakers' rights.

17. Similarly, we cannot accept plaintiffs' intimations that the First Amendment requires the City to remove trees, flower boxes, newspaper machines or sidewalk cafes as an alternative to restricting their right to perform on Friday and Saturday nights.

18. To summarize Conclusions 13–17, no reasonable, less restrictive alternatives were available to the City for dealing with crowd conditions in the Rush Street area for 1985.

19. The ordinance leaves open ample alternative channels of communication for plaintiffs in the Rush Street area. As pared in Conclusion 9, the ordinance specifically applies only for eight hours during the week. The area draws many people at other times during the week, and plaintiffs can play then. Moreover, the area is a small part of the City. The State Street Mall and other parts of the City can provide large, if not as affluent or mellow, audiences for performers.

20. The plaintiffs' reliance on *Schad v. Borough of Mt. Ephraim*, 452 U.S. 61, 75–77, 101 S.Ct. 2176, 2186–87, 68 L.Ed.2d 671 (1981) is misplaced. There the Court held that a zoning ordinance which totally prohibited all forms of live entertainment within a town violated the First Amendment. In so ruling, the Court reasoned, among other things, that such a total ban left open no alternative channels of communication within the City. Such is not the case here, where only eight hours are now banned at Rush Street, and only a small part of the City is covered. Even if Rush Street is unique, such that it can be considered an entity unto itself analogous to Mount Ephraim, the ban is much narrower than the blanket prohibition in that case. Only one form of entertainment is targeted and only for a few hours. In contrast to *Schad*, the City has not banned all live entertainment in the area covered by the ordinance, but only live entertainment performed on the sidewalks during the hours when crowds are heavy enough to create a hazardous condition.

21. Similarly, the plaintiffs mistakenly rely on *Davenport v. City of Alexandria, Va.*, 748 F.2d 208 (4th Cir.1984), in which the Court affirmed a district court's holding that a City's total ban on street performers in the City's central business district for all hours was too broad under the First Amendment. In this case, the ban in the Rush Street area is much narrower, covering only the eight most crowded hours in a much smaller geographical area of the City.

22. With respect to the Division Street area, the ban is much broader. Section 1(c) bans all street performances at all times on the half-block on Division Street from Dearborn Street to State Street. That block contains very narrow sidewalks,

several popular taverns, and draws extremely heavy crowds. As such, the ban is valid at least for the times covered by the abutting Rush Street area. We have some doubts, however, whether, in light of *Davenport* or *Schad*, a total ban at all times is necessary. For example, we doubt that crowds are heavy there during many weekday morning or afternoon hours, such that performers could not play even on Division's narrow sidewalks. No evidence suggests that crowds are significant then. *See* Def.Ex. L–6 (pedestrian flow study). However, in their zeal to prove that street performers are self-regulating, plaintiffs have urged repeatedly that no class member has performed or desires to perform on Division's narrow sidewalks. Accordingly, they concededly lack standing to challenge Section 1(c) of the ordinance. *See, e.g., City of Los Angeles v. Lyons,* 461 U.S. 95, 103 S.Ct. 1660, 1665, 75 L.Ed.2d 675 (1983) (to establish case or controversy plaintiff must show he or she has sustained or is in immediate danger of sustaining some direct injury that is real and not conjectural).

■ 23. The Michigan Avenue area restrictions, contained in Section 1(b) of the ordinance, are also more extensive than those on Rush Street. They totally ban performances on Saturdays and Sundays. They ban performances every weekday for ten hours, between 11 a.m. and 2 p.m. and 4 p.m. to 11 p.m.[7] In effect then, performances are allowed *only* between 8 a.m. and 11 a.m. and 2 p.m. to 4 p.m. on weekdays.

24. Much of the legal analysis of the foregoing conclusions applies with equal force to the Michigan Avenue area. When crowds were heavy in 1984, popular performers caused hazardous conditions to occur, which diverted available police resources from other pressing needs. The ban is a necessary means to address the City's compelling interest in safe pedestrian passage, and alternatives less restrictive than a ban during the most crowded hours were not available to the City.

25. However, the extent of the ban is much broader than necessary to protect the City's compelling interests in safety. The City has failed to sustain its burden of showing that a ban is necessary for all of the hours specified in the ordinance. Sergeant Flanagan's testimony, upon which the City principally relies, indicates that crowds are heaviest during weekdays from 11 a.m. to 2 p.m. ("the noon-hour rush") and from 4 p.m. to 7 p.m. ("the afternoon rush"). We may also take judicial notice that such is the case. But very little evidence supports the City's assertion that crowds and traffic remain nearly as dense after 7 p.m. on Monday through Thursday. Indeed, pedestrian flow studies indicate that numbers of people and vehicles fall off dramatically after 7 p.m. on weeknights. (*See* Def.Exs. L–7, L–8). We may take judicial notice that the major stores on Michigan close at 7 p.m. on Mondays and Thursdays and 6 p.m. on Tuesdays and Wednesdays. *See also* Stipulation 2(6). Thus, the shopping crowd, which accounts for a significant percentage of the Michigan Avenue traffic, vanishes soon after shopping ends on weekdays. Given all of these facts, we hold that the City has failed to prove that crowds are heavy enough to warrant a ban on street performances after 7:30 p.m. on weekdays.

26. Similarly, while evidence suggests that crowds are heavy on Saturdays and Sundays, the City has not carried its burden of showing that a ban is necessary during all hours on Sunday. Stores close at 5 p.m. on Sunday. *See* Rule 201(b)(2) (judicial notice); *also* Stipulation 2(6). The record does not convince us that crowds on Sunday evening are heavy enough to warrant a special total ban on street performances after 5:30 p.m. on Sunday.

27. As narrowed in Conclusions 25 and 26, the ordinance bans performances between 11 a.m. and 2 p.m., as well as 4 p.m.–7:30 p.m. on Mondays through Thursdays; between 11 a.m. and 2 p.m. and 4 p.m.–11 p.m. on Fridays; all day Saturdays;

**7.** Section 1(b) also bans performances at all times at Michigan Avenue between Thanksgiving and Christmas. We deal with this aspect of the ordinance in Conclusion 28.

and all day on Sundays until 5:30 p.m. We are persuaded by the evidence that crowd and traffic conditions were dense enough during those times to create serious safety problems when performers draw large audiences. Applying the analysis detailed in Conclusions 3–8, 11–21, we hold that the ordinance as narrowed satisfies the rigorous demands of the First Amendment.

28. We also uphold Section 1(b) of the ordinance with respect to its total ban of performances during the Christmas season. The record shows that crowds are especially heavy then, and stores keep long hours. However, we uphold this part of the ordinance for the same reasons that we upheld the Division Street ban. Plaintiffs have not shown that they did or intend to perform during the cold Christmas season. Indeed, as plaintiffs' counsel pointedly asked Sergeant Flanagan on cross-examination, "You never saw a breakdancer dancing on snow, did you?" Although intending to show that the ban was not necessary at that time, the plaintiffs implicitly admitted here and elsewhere that they lack standing on this issue, since their First Amendment interests have not been, and apparently will not be, implicated by the Christmastime ban.

29. With respect to those portions of Section 1(b) that we have upheld, we note again that much depends on the evidence that serious safety problems in fact occurred in 1984. However, Sergeant Flanagan testified that the performances were primarily by breakdancers, *see* Flanagan testimony at 18–19, and that *only* breakdancers ever caused pedestrians to flow into the street in 1984. *Id.* at 39. Indeed, Sergeant Flanagan said he never paid much attention to performers other than breakdancers. *Id.* at 31. Thus, to the extent breakdancing has run its course and that no other entertainment fad demanding large sidewalk space and attracting big crowds replaces it, the potentially hazardous conditions which upheld the ordinance may very well no longer exist. The City should consider seriously any changed conditions if and when it begins the process of re-enacting the Second Amended Ordinance.

30. At closing argument, plaintiffs' counsel also challenged Chapter 36.1–5(d)(1) of the ordinance, as amended, *see* Finding 5, which mandates that performers maintain at least six feet of sidewalks clear for pedestrian passage when they perform anywhere in the City. We grant the City's oral motion to strike that challenge. Such a claim was not raised in the amended complaint, and the City did not address it fully at trial. We hold that the City did not impliedly consent to try that issue, and it was prejudiced by its failure to do so. Accordingly, we deny what amounts to plaintiffs' implicit motion to amend its complaint to conform to whatever proof it might have introduced on this section of the amended ordinance. *See* Fed.R.Civ.P. 15(b).

31. However, plaintiffs' additional challenge to the "noise control" section of the ordinance is meritorious. That section forbids performers to use sound amplification equipment unless granted a special permit issued by the City Council. *See* Findings 4, 4A. The section does not specify how to obtain such a permit and sets no standards or guidelines concerning the granting of such a license. Although the City plainly may impose reasonable limitations on performer's volume, *see Grayned v. City of Rockford,* 408 U.S. 104, 116, 92 S.Ct. 2294, 2303, 33 L.Ed.2d 222 (1972), it has done so here via the prior restraint of a license, with no restraint on official discretion concerning when to grant a license. Such a restraint violates the First Amendment. *See, e.g., Shuttlesworth v. City of Birmingham,* 394 U.S. 147, 150–51, 89 S.Ct. 935, 938, 22 L.Ed.2d 162 (1969) ("a law subjecting the exercise of First Amendment freedoms to the prior restraint of a license, without narrow, objective, and definite standards to guide the licensing authority, is unconstitutional"); *cf. Davenport v. City of Alexandria,* 710 F.2d 148, 150 (4th Cir.1983) (upholding permit requirement for street performers because standards were precisely defined and city officials had no discretion about whether to

issue a permit). The City contends that these permits are granted as a matter of right, but the ordinance does not say that. Under its literal terms, no standard controls official discretion as to granting permits. Thus, we reject the City's defense of the amplification permit requirement of Section 36.1–5(c).[8]

■ 32. The plaintiffs' equal protection challenge to the Second Amended Ordinance must fail to the same extent that its First Amendment claim failed. We note first that the Equal Protection Clause applies to this ordinance since it limits only one class of speakers, "performers"; if religious groups wish to perform or people wish to speak or picket, the Second Amended Ordinance does not apply. However, the Supreme Court has recognized that where legislative classifications affect fundamental First Amendment rights, equal protection analysis largely coincides with First Amendment analysis. *See Police Dept. of City of Chicago v. Mosley*, 408 U.S. 92, 94–95, 92 S.Ct. 2286, 2289–90, 33 L.Ed.2d 212 (1972). Both amendments require strict judicial scrutiny of the asserted governmental ends and of how closely the means chosen serve those ends. *Id.* at 98–102, 92 S.Ct. at 2291–94. This is the analysis we employed in Conclusions 3–8, 11–21, and our conclusions apply with equal force to both the First Amendment and Equal Protection claims.

33. One aspect of the equal protection analysis should be addressed before moving on. At closing argument, we expressed concern along equal protection lines that the ordinance prohibits, for example, a guitarist for pleasure or profit but not a guitarist soliciting or advocating for a religious or political group, the latter of which is of course theoretically capable of drawing a large audience. Despite this potential underinclusiveness, we think the ordinance as narrowed must stand. Strict scrutiny demands very precise governmental classification, but not perfection. No evidence showed that any performer other

than one defined as such by the ordinance ever drew an audience which created a serious safety problem. As such, banning performers like religious solicitors, would be unnecessary, as well as potentially offensive to other First Amendment interests. In sum, we think the City's restrictions reached both as broadly and as narrowly as necessary to achieve its interests in public safety and do not violate equal protection principles.

■ 34. Finally, we reject plaintiffs' separate equal protection challenge to Chapter 36.1–5(b)(1), as amended, which bans performances everywhere in the City after 10 p.m. on Sunday through Thursday and 11 p.m. on Friday and Saturday. *See* Finding 5A. We note first that this general time regulation does not offend the First Amendment. While many areas of the City, including Rush Street or Michigan Avenue, could probably accommodate performances at later hours, as such shows would not be "basically incompatible with the normal activity of a particular place at a particular time," *Grayned v. City of Rockford*, 408 U.S. 104, 116, 92 S.Ct. 2294, 2303, 33 L.Ed.2d 222 (1972), the City was not obligated to identify and make special rules for all of the scores of main areas in the City that could host such performances after 10 or 11 p.m. *See National Anti-Drug Coalition, Inc. v. Bolger*, 737 F.2d 717, 727 (7th Cir.1984).

35. Having concluded that the City properly drew city-wide "curfews" for performances, we turn to and reject plaintiffs' equal protection complaint that such curfews are directed only at them, but not at other speakers, such as politicians or leafletters. We presume that this aspect of the ordinance exists primarily to regulate noise. The evidence has shown, and we may judicially notice that, most street performances are noisy. Amplifiers are common; but even when amplifiers are not used, performances are often loud, such as when a saxophonist or bongo-drummer plays. *See* Finding 49. Also, as plaintiffs

---

**8.** We express no opinion on plaintiffs' equal protection challenge to this provision or on the viability of a noise provision if a valid permit system is adopted.

have emphasized elsewhere, street performances are common. Other sorts of noisy speech are not. We think the City properly singled out and restricted performers as a recurring and special source of noise. Noise from performers was definitely a problem for the residents who testified. Although the City has a general anti-noise ordinance, a special one directed at street performers was necessary to deal with the regular noise problems caused by performers. It is well established that cities may reasonably restrict noisy speech. *See, e.g. Grayned,* 408 U.S. at 117, 92 S.Ct. at 2304; *Concerned Jewish Youth v. McGuire,* 621 F.2d 471, 477 (2d Cir.1980). Banning performances generally during late night and early morning hours is closely related both to the times when such performances would be most offensive and to the performers most likely to make such noise. Moreover, many alternative times are left open for noisy expression. In short, we perceive no equal protection problem with Chapter 36.1–5(b)(1).

## CONCLUSION

For the foregoing reasons, the Court declares that the ordinances at issue are unconstitutional to the extent they:

a. Ban performances in the Rush Street area on Wednesdays between 3 p.m. and 11 p.m., and on Fridays and Saturdays from 3 p.m. to 7 p.m.

b. Ban performances on Rush Street south of Oak during the operative hours of the Second Amended Ordinance.

c. Ban performances in the Michigan Avenue area between 7:30 and 10 p.m. on Weekdays and 5:30 and 10 p.m. on Sundays.

d. Require a special permit for sound amplifiers.

Our "surgical excision" of the constitutionally defective parts of an ordinance is proper, since we have not completely reconstructed the ordinance in the process. *See* Conclusion 8A. The City is enjoined from enforcing the ordinance's bans to the extent we have held them constitutionally

defective. In all other respects, we uphold the ordinances and therefore deny the remaining aspects of plaintiffs' request for permanent injunctive relief. It is so ordered.

We conclude by noting that the ordinance's sunset provision gives the City an ideal opportunity to carefully re-evaluate the ordinance. We have already noted the possibility that changing circumstances may very well have undermined the City's reliance on public safety to justify the ordinance. We also note that the City in its understandable desire to address the street performers problem as soon as possible was perhaps not as thorough as it could have been in evaluating the situation before enacting the amended ordinances. *See* Findings 72–76. The City now has an opportunity to make a careful study of crowd conditions and their relationship to street performers, should it decide to re-enact the ordinance. A future determination of the constitutionality of a renewed ordinance may very well hinge on its doing so.